UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ACADEMY OF ALLERGY & ASTHMA IN PRIMARY CARE and UNITED BIOLOGICS, LLC D/B/A UNITED ALLERGY SERVICES. | § § § § § | |
| Plaintiffs, | § § § | |
| v. | § § | Civil Action No. 5:17-CV-01122-FB (HJB) |
| SUPERIOR HEALTHPLAN, INC. and CENTENE CORP. | § § § | |
| Defendants. | § § § | |

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

STATEMENT OF UNDISPUTED FACTS ....................................................... 2

    A.    Superior Discovers UAS Offering Allergy Care and
Communicates with Other MCOs ................................................ 2

    B.    The Restrictive Policy Regarding Reimbursement of Allergy Care ........... 5

    C.    Defendants Enact Policies Limiting Reimbursement of PCPs
Practicing Allergy Care and Target Physicians. ....................... 6

    D.    Defendants Continue on with a Group Boycott Using Legally
Questionable Policies. ................................................................. 9

    E.    Both Superior and Centene Target Physicians With Restrictions. ........... 10

    F.    Procedural History and Claims Asserted ................................. 11

LEGAL STANDARD ........................................................................................ 12

SUMMARY OF ARGUMENT ......................................................................... 13

ARGUMENT ..................................................................................................... 14

    I.    The Court Should Grant Summary Judgment Against Various Pled
Affirmative Defenses .................................................................. 14

    A.    Defendants' *Illinois Brick* Defense is Inapplicable as a Matter of
Law. ............................................................................................. 15

    B.    Defendants Cannot Identify Any Support for their First
Amendment Defense .................................................................. 20

    C.    Defendants' Defense of Legitimate Competition Has No Support. ......... 22

    D.    Defendants Have Not Properly Raised Any Defense Related to
Alleged Necessary and Indispensable Parties. ......................... 22

    E.    Defendants Have Not Identified Any Failure to Mitigate by
Plaintiffs. .................................................................................... 23

    F.    Defendants Cannot Identify Any Conduct Supporting Unclean
Hands. ......................................................................................... 24

II.    The Court Should Grant Partial Summary Judgment on Plaintiffs' Claim for Declaratory Relief by Construing Certain Health Care Statutes and Regulations Prohibiting Discriminatory Conduct..................................................24

    A.    Discrimination Against Classes of Providers Contradicts Government Program Regulations............................................................25

    B.    The Statutory Interpretation of Defendants' Expert that the Restrictions do Not Apply to "Reimbursement" Contradicts the Law. ......................................................................................................26

CONCLUSION...................................................................................................................29

# TABLE OF AUTHORITIES

Page(s)

Cases

*Academy of Allergy & Asthma in Primary Care, et al. v. Louisiana Health Serv. &*
*Indemn. Co., et al.*,
Case No. 2:18-cv-00399-CJP-DPC (E.D. La. May 14, 2021) ............................................18, 19

*Academy of Allergy & Asthma in Primary Care v. Allergy & Asthma*
*Network/Mothers of Asthmatics, Inc.*,
Civil No. 5:14-CV-35-OLG (W.D. Tex. Sept. 29, 2017) ..................................................15, 17

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988)..........................................................................................................21

*Allstate Ins. Co. v. Plambeck*,
No. 3-08-CV-0388-M, 2009 WL 347423 (N.D. Tex. Feb. 11, 2009) ....................................23

*American Tobacco Co. v. United States*,
328 U.S. 781 (1946)..........................................................................................................28

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..........................................................................................................12

*Andrx Pharm., Inc. v. Biovail Corp., Int'l*,
256 F.3d 799 (D.C. Cir. 2001) .....................................................................................17, 18

*Apple, Inc. v. Pepper*,
139 S.Ct. 1514 (2019)...................................................................................................16, 20

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983)......................................................................................................16, 19

*Blue Shield of Va. v. McCready*,
457 U.S. 465 (1982)......................................................................................................15, 16

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..........................................................................................................12

*Claimant ID 100235033 v BP Exploration & Prod. Inc.*,
941 F.3d 801 (5th Cir. 2019) .............................................................................................24

*Energy Intelligence Group, Inc. v. Kayne Anderson Capital Advisors, L.P.*,
948 F.3d 261 (5th Cir. 2020) ........................................................................................23, 24

*United States v. General Motors Corp.*,
384 U.S. 127 (1966)......................................................................................................22, 28

*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490 (1949)..............................................................................21

*Herpich v. Wallace*,
    430 F.2d 792 (5th Cir. 1970) ...........................................................23

*Hughes v. Tobacco Institute, Inc.*,
    278 F.3d 417 (5th Cir. 2001) ...........................................................19

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977)................................................................ *passim*

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
    359 U.S. 207 (1959)..............................................................................14

*Kornman & Associates, Inc. v. United States*,
    527 F.3d 443 (5th Cir. 2008) ...........................................................12

*McCormack v. Nat'l Collegiate Athletic Ass'n*,
    845 F.2d 1338 (5th Cir. 1988) .........................................................18

*Miss. River Basin Alliance v. Westphal*,
    230 F.3d 170 (5th Cir. 2000) ...........................................................12

*Mitchell Bros. Film Grp. v. Cinema Adult Theater*,
    604 F.2d 852 (5th Cir. 1979) ...........................................................24

*Norris v. Hearst Trust*,
    500 F.3d 454 (5th Cir. 2007) ....................................................18, 19

*Rosado v. Deters*,
    5 F.3d 119 (5th Cir. 1993) ...............................................................12

*Tennessee Valley Sand & Gravel Co. v. M/V Delta*,
    598 F.2d 930 (5th Cir. 1979) ...........................................................23

*Wilson P. Abraham Constr. Corp. v. Tex. Indus., Inc.*,
    604 F.2d 897 (5th Cir. 1979) ...........................................................23

## Statutes and Codes

United States Code
    Title 15, Section 1 ...............................................................14, 18, 22
    Title 15, Section 15 .............................................................................14
    Title15, Section 26 ..............................................................................14
    Title 42, Section 300gg-5....................................................................25
    Title 42, Section 1396u-2(b)(7) .........................................................25

<u>Rules and Regulations</u>

Code of Federal Regulations

Title 42, Section 438.12 ...........................................................................................25, 26, 28

Title 81, Section 27498-01 .......................................................................................................28

Title 81, Section 27749-50 (May 6, 2016)...............................................................................28

Rule 19 .......................................................................................................................................23

Rule 30(b)(6)............................................................................................................2, 20, 22, 24

Rule 56 ...................................................................................................................................1, 12

Rule 56(c)...................................................................................................................................12

**TO THE HONORABLE MAGISTRATE JUDGE BEMPORAD:**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs United Biologics, LLC d/b/a United Allergy Services ("UAS") and Academy of Allergy & Asthma in Primary Care ("AAAPC"; collectively with UAS, "Plaintiffs") respectfully file this Motion for Partial Summary Judgment, and in support thereof, show the Court the following:

## <u>INTRODUCTION</u>

As this Court has previously observed in prior orders, direct evidence indicates that Defendants Superior HealthPlan, Inc. ("Superior") and Centene Corp. ("Centene"; collectively with Superior, "Defendants") conspired with other Texas managed care organizations ("MCOs") to restrict output of allergy testing and immunotherapy services. Upon admittedly detecting a substantial uptick in those services, Defendants sought ways to limit reimbursement of expanding allergy testing and immunotherapy services at primary care clinics. After learning that UAS was the source of the expansion, representatives of Superior and Centene communicated with other Texas MCOs. Such communications included receiving another MCO's allergy testing and immunotherapy policy that restricted care to specialists, which policy was copied almost verbatim and ultimately adopted in substance by Superior and Centene. Moreover, these same representatives of Defendants visited with various physicians they found to be contracting with UAS, and their internal notes clearly detail they were successful in causing those customers to refuse to deal with UAS any longer.

These facts are essentially indisputable, yet Plaintiffs recognize that Defendants maintain after the fact that there was no agreement and assert that Plaintiffs still need to convince a jury notwithstanding the mountain of documentary evidence. While Plaintiffs are prepared to do so, they bring this motion because Defendants have pled numerous affirmative defenses that either do

1

not apply or for which there is not legally sufficient evidence for jury consideration. Thus, this motion addresses the following affirmative defenses that must be summarily disposed – the defenses of: (a) *Illinois Brick*, (b) the First Amendment to the U.S. Constitution, (c) "legitimate competition," (d) failure to join necessary and indispensable parties, (e) failure to mitigate, and (f) unclean hands. Moreover, this motion also addresses the need for this Court to interpret antidiscrimination provisions, which Defendants attempt to use to justify their illegal behavior.

## STATEMENT OF UNDISPUTED FACTS

### A.   Superior Discovers UAS Offering Allergy Care and Communicates with Other MCOs.

In 2009, UAS first began providing the necessary economic and technical components of allergy testing and immunotherapy to primary care physicians ("PCPs") that allowed PCPs to treat their patients for allergic rhinitis utilizing allergy skin prick testing and allergen immunotherapy. Declaration of Nicolas Hollis ("Hollis Decl.") ¶ 2. Superior, a subsidiary of a New York Stock Exchange corporation named Centene, operates in Texas as a MCO and as an operative for other Centene subsidiaries that are engaged in the health insurance industry. Exhibit 1 (Centene Rule 30(b)(6) Tr. 24:12-19; 31:5-36:21). None of Centene, Superior or any of Centene's other subsidiaries that provide insurance products in Texas has any employees, and all operate through contracts with two Centene subsidiaries named Centene Management Company, LLC ("CMC") and Centene of Texas, Ltd. ("CTX"). *Id.*

In late 2012, Superior began denying claims by PCPs in Superior's provider network for reimbursement for allergy testing and allergen immunotherapy that were identified as outliers by an independent company named Health Care Insight ("HCI") because they had not been traditionally provided and submitted for reimbursement by the identified PCPs. Exhibit 2 (Harmon Tr. 55:11-56:17); Exhibit 3 (SHP3595), Exhibit 4 (SHP5794), Exhibit 5 (SHP5777-79). The

outlier claims identified by HCI were provided to the Special Investigations Unit ("SIU") of Centene, which in turn made recommendations for handling, or handled, such claims. Exhibit 2 (Harmon Tr. 27:16-29:16); Exhibit 6 (SHP2548-81), Exhibit 7(SHP4603-04), Exhibit 3, Exhibit 8 (SHP10484-86), Exhibit 9 (SHP10487), Exhibit 10 (SHP10490-92). The methods for denial included erecting large barriers for reimbursement payment reviews by SIU and making requests for medical records. Exhibits 8-10. It is notable that up until this time, Centene and Superior officers, such as Cheryl Cizler, internally stated to SIU that:

> I don't think findings on 3 members in a 6 month period warrants an investigation. There are no (or very limited) pediatric allergy providers in El Paso. Don't see this as an issue, and system edits should be catching inappropriate billing per Medicaid benefit limits.

Exhibit 11 (CUA001258); and

> Instead of claim denials for the PCPs billing antigen therapy, recommend PR outreach. Allergy treatment through the PCP is not inappropriate, and Allergy-Immun specialists are not abundant in most areas of Texas. They typically reserve their slots for commercial patients.

Exhibit 12 (CUA000413).

On January 16, 2013, HCI identified Dr. Vernoy Walker, a part-time Superior Medical director, as one of the PCPs who was engaged in the provision of allergy testing. Exhibit 4. SIU then sought guidance from Dr. David Harmon, Chief Medical Director at Superior, as to how to handle the situation. Exhibit 13 (SHP5710-11). Dr. Harmon then sought guidance from Superior's CEO and Centene executive, Tom Wise, as to how to handle Dr. Walker's engagement in allergy services; Dr. Harmon was told to meet with Dr. Walker to learn "what is going on." Exhibit 4, Exhibit 14 (SHP15870). Dr. Harmon learned that Dr. Walker's clinic was in an arrangement with UAS to provide services to the clinic to allow it to provide allergy testing and allergen immunotherapy to its patients. Exhibit 13. On February 14, 2013, Dr. Harmon explained to Dr.

Walker via email that once Superior identified a PCP practicing allergy and prescribing home immunotherapy, the PCP "will be placed on pre-payment review and these services will not be reimbursed." Exhibit 15 (SHP5793). On February 15, 2013, Superior's Tom Wise sent an email to Superior Vice President Bill Reichmuth requesting "a full review of Dr. Vernoy Walker (El Paso), relationships, etc. he is one of our long time practicing Medical Directors…. I would like to understand the outside relationships that he has. I am probably heading down a path of removing him as a Medical Director, and we are getting ready to block certain codes for payment." Exhibit 16 (SHP15868).

When PCPs practicing allergy testing and allergen immunotherapy in contract with UAS came to light, Dr. Harmon sought information regarding "who is billing like this, and how much did we pay out" to understand the volume of these claims. Exhibit 17 (SHP5791-92). Subsequently, Dr. Harmon met with Superior's Credentialing Committee and reported "a large portion of PCPs in Superior's network throughout the State are providing Immunotherapy. Due to these significant findings, staff pulled a list of all the PCPs in the state of Texas providing Immunotherapy to investigate their credentialing packets." Exhibit 18 (SHP5491).

Initially, Superior utilized several different methods to deny claims for reimbursement for PCPs' provision of allergy testing and allergen immunotherapy, including prepayment review by SIU, requests for medical records, and denials after review of medical records. Exhibit 19 (UAS00019427-33), Exhibits 8-10. Superior also failed to respond timely to provider appeals for the denial of reimbursement claims. Hollis Decl. ¶ 6. Thereafter, Superior set about trying to create and implement a policy that it internally indicated it could rely on to deny claims in the future; Superior ultimately determined to implement a credentialing policy to deny PCPs reimbursement claims for allergy testing and allergen immunotherapy. Exhibit 20 (SHP0538-39).

## B.      The Restrictive Policy Regarding Reimbursement of Allergy Care.

The policies Superior and Centene adopted to restrict allergy care to specialists originated from three other Texas MCOs with whom Superior would ultimately communicate in 2013. The origination of those policies had begun earlier when the medical directors of two other Texas MCOs—Dr. Barry Lachman, Medical Director of Parkland Community Health Plan, Inc. ("Parkland"), and Dr. Fred Buckwold, Medical Director of Community Health Choice ("CHC")—discussed how best to treat reimbursement claims of PCPs practicing allergy testing and allergen immunotherapy. Exhibit 21 (Buckwold Tr. 73:12-25); Exhibit 21-1 (Buckwold Tr. Ex. 15). The discussion between Drs. Lachman and Buckwold included the concept of requiring credentialing of PCPs to provide allergy services. In May 2011, Dr. Buckwold collaborated with another Texas MCO, Texas Children's Health Plan ("TCHP"), to draft a new credentialing policy and procedure for CHC—modeled after TCHP's credentialing policy and procedure—that required credentialing by the MCO for PCPs to be reimbursed for allergy testing and allergen immunotherapy. *Id.*

On April 8, 2013, Superior first came upon adopting the same concept when Dr. Harmon attended a meeting in which allergy care was discussed with the medical directors of Superior's competitors, including CHC's Dr. Buckwold. Exhibit 22 (SHP2514). Dr. Buckwold informed Dr. Harmon that CHC had instituted a credentialing policy to eliminate PCPs from the practice of allergy testing and allergen immunotherapy. Dr. Harmon requested copies of that policy by email on April 9, 2013 and again on April 15, 2013. *Id.*, Exhibit 23 (SHP2619). On April 15, 2013, Dr. Buckwold responded to the request by providing Dr. Harmon with CHC's then-current credentialing policy, and he requested that Dr. Harmon make suggestions for improvements to the policy. Exhibit 23, Exhibit 24 (SHP2620-22). The policy that Dr. Buckwold provided to Dr. Harmon stated that "[a]llergy skin testing, assessment of test results, and decision-making regarding therapy is considered to be a specialty area." Exhibit 24. Further, to provide allergy

testing and treatment to CHC members, "a provider must be credentialed for this by the Medical Care Management Committee."  Exhibit 24.

In April, May, and June 2013, Superior's Credentialing Committee met and considered a credentialing policy that was identical to the credentialing policy provided by CHC to Superior. Exhibit 25 (SHP5490), Exhibit 26 (SHP5492), Exhibit 27 (SHP5496), Exhibit 28 (Mills Tr. 40:2-44:22). Ultimately, Superior copied the CHC policy, changing only the name from CHC to Superior. Exhibit 28. On June 15, 2013, Superior's Credentialing Committee adopted the credentialing policy. *Id.*; Exhibit 23, Exhibit 29 (SHP5700). The policy restricted Superior's reimbursement for allergy testing and allergen immunotherapy to board-certified allergists and those credentialed by Superior's Credentialing Committee. Exhibit 29, Exhibit 30 (SHP4620).

Further, in June 2013, CHC's Dr. Buckwold also provided the same credentialing policy that Superior was considering to Dr. David Palafox, medical director of El Paso First Health Plan ("El Paso First")—another Texas MCO—with instructions on its implementation. Exhibit 31 (Palafox Tr. 242:22-245:16); Exhibit 31-3 (Palafox Tr. Ex. 18). When later questioned under oath about why CHC sent him the policy, Dr. Palafox explained that "because the other health plans were already aware of this, they took the lead in giving me direction on how to proceed to make this benefit appropriate for our provider network." *Id.*

### C.     Defendants Enact Policies Limiting Reimbursement of PCPs Practicing Allergy Care and Target Physicians.

On August 2, 2013, Superior issued a "Provider News Alert" announcing its intention to implement its "credentialing policy," effective October 1, 2013, and stating that Superior would consider allergy skin testing and immunotherapy to be a "specialty area." Exhibit 20. The August 2, 2013 Provider News Alert stated that following the adoption of this policy, Superior would no longer reimburse physicians for allergy services unless the services were provided by allergists or

other credentialed specialists. Exhibit 20. Thus, upon the effective date of October 1, 2013, PCPs were directed to refer their Texas Medicaid patients receiving allergy care to a specialist for allergy skin testing or immunotherapy. *Id.* However, Superior's policy did not go into effect on October 1, 2013. On the evening before the policy was to become effective, the Health and Human Services Commission ("HHSC") requested Superior not to implement the policy. Exhibit 32 (SHP2515), Exhibit 33 (SHP4518), Exhibit 34 (SHP15800). When questioned about the policy on September 30, 2013, Superior and Centene executive Holly Munin told HHSC representatives that CHC "has the same Allergy policy. . . . evidently this has been a Medical Director discussion topic." Exhibit 35 (SHP10871). Nevertheless, Superior abided by HHSC's request the next day. Exhibit 36 (SHP09523).

Meanwhile, on October 1, 2013, the same day Superior's new reimbursement policy was set to go into effect but did not, Dr. Lachman sent letters to multiple PCPs stating PCPs may not provide allergy skin testing or immunotherapy and that, effective October 4, 2013, Parkland would no longer reimburse primary care providers for those claims. Exhibit 37 (Lachman Tr. 93:9-21); Exhibit 37-1 (Lachman Tr. Ex. 9). The letters also stated that "[u]sing this provider [UAS] puts you in violation of your contract, which could subject you to termination of your contract with [Parkland]." *Id.* Parkland's Dr. Lachman followed up with letters calls to PCPs in October and November 2013 to enforce this policy. Exhibit 37, Exhibit 37-2 (Lachman Tr. Ex. 13).

While Parkland was moving forward with its policy, Superior sought out information on how to enact the policy it had agreed to withdraw. And in a November 19, 2013 email, Dr. Harmon directed Superior employee Denise Herrera and Dr. Gilbert Handal, Superior's paid consultant, to visit with UAS-contracted doctors in El Paso, and stated as follows:

> [T]his is a list of physicians whose claims have been denied for certain allergy services. I would like you to select a couple of El Paso physicians from this list and

go out with Dr. Handal to visit and learn more about the process is followed for these allergy services. Any physician on this list uses a technician from United Allergy in their practice. I want to know how they got started with United Allergy, what type of training they receive, and how do they identify patients to refer to the technician. Beyond that, I would like to know what the technicians role is and how it is determined to start a patient on immunotherapy. Once the decision is made, how is the immunotherapy ordered, who mixes it, and then how is it administered and where is it administered. What emergency protocols do they have in place for adverse reactions. I would like this to happen as soon as possible. Thanks.

Exhibit 38 (SHP4441). By that time, El Paso First had also been sending letters to PCPs practicing allergy testing and allergen immunotherapy utilizing services provided by UAS and seeking recoupment for claims previously paid for allergy testing and allergen immunotherapy. Exhibit 31 (Palafox Tr. 208:4-221:7); Palafox Exhibit 31-1 (Palafox Tr. Ex. 14); Exhibit 31-2 (Palafox Tr. Ex. 15). And just days before Superior's direction on El Paso physicians, on November 14, 2013, Parkland's Dr. Lachman emailed El Paso First's Dr. Palafox and included letters that Parkland had sent to PCPs, which Dr. Lachman suggested only needed to be put on El Paso First letterhead and that Dr. Palafox "will need to change the contract references and prior authorization language to match El Paso First, of course." Exhibit 37, Exhibit 37-3 (Lachman Tr. Ex. 14).

By December 2, 2013, Dr. Handal reported back to Superior that he had visited with Dr. Salloum, a physician who had received letters from both Superior and El Paso First, and that "[he] did discuss the issue already with Dr. Salloum who will drop from the program altogether and I will discuss it with Dr. Segapelli from the EPPA as soon as we get an appointment with him." Exhibit 39 (SHP4282). Dr. Handal also visited with Dr. Liptakova, who agreed to drop from the program. Exhibit 40 (Handal Tr. 94:11-95:8).

**D.**     **Defendants Continue on with a Group Boycott Using Legally Questionable Policies.**

Meanwhile, internal efforts by Superior to justify the policy were assigned to newly hired Dr. Brendle Glomb, formerly the Chief Medical Officer of HHSC and the current medical director at Superior. On December 10, 2013, Dr. Glomb reported the following by email:

> I have done an exhaustive search of the internet, Pub Med, Hayes, and Cochrane, as well as called my two allergist contacts\experts… . Although, we certainly believe that patient safety and quality of care issues will most assuredly suffer at the hands of these neo-allergists. . . the literature is not our friend…. I have some ideas about which way to go but am dubious that we will be able to withstand any legal challenge.

Exhibit 41 (SHP4272-77). Nevertheless, on December 16, 2013, Dr. Glomb circulated an updated draft of the credentialing policy, which he stated was "[w]ritten to look more daunting than it is enforceable. . . . It will look scary to the guys and gals [PCPs] not used to providing this level of supervision, records-keeping, and personal responsibility. . . ." Exhibit 42 (SHP4213-22).

These efforts of the same MCOs approaching physicians about UAS continued into 2014. For example, in January 2014, Parkland continued to send letters to PCPs advising them of recoupment of all claims paid to any PCP whom it had ever paid for allergy testing or immunotherapy that they had provided in conjunction with UAS. Exhibit 43 (Lachman Tr. 266:1-267:12 (2015)); Exhibit 43-1 (Lachman Tr. Ex. 42 (2015)).

On January 15, 2014, Superior learned that UAS had recently filed an antitrust suit against various allergists for attempts to convince insurance companies to restrict payment to specialists from the following email to Superior from its outside counsel with the complaint attached:

> Here is [UAS's] complaint filed in federal district court. You certainly don't need to read the whole thing but I'd take a look at the following – pp. 2-3 (Nature of the Case) provides a concise summary of their antitrust claims; and pp. 27-28 specifically mentions Superior, Parkland, and El Paso First Health Plans as taking measures to deny their clients from participating in providing allergy services.

Exhibit 44 (SHP5623).

And after receiving the email with the complaint, Superior's Dr. Harmon forwarded it by email to CHC's Dr. Buckwold, Parkland's Dr. Lachman, El Paso First's Dr. Palafox, and Texas Children's Dr. Giardino, stating: "[a]ll your plans are mentioned in this lawsuit, but only Barry had the dubious distinction of being named specifically." Exhibit 44. El Paso First responded to Superior's email through Dr. Palafox, who stated: "Dr. Barry, CONGRATULATIONS!!" Meanwhile Parkland's Dr. Barry Lachman responded to the group stating: "This email track is discoverable. Therefore, I will not comment except to say that the information in the letter about [Parkland] is distorted and inaccurate." Exhibit 45 (SHP5621). Subsequently Dr. Palafox responded to just Dr. Harmon, stating: "Thanks for the info as I did not know. . I guess we are doing something right" Exhibit 46 (SHP5625). Meanwhile, within the next month El Paso First would withdraw its own draft credentialing policy after internally acknowledging that it could be a witness in an ongoing lawsuit involving UAS. Exhibit 47 (Dominguez Tr. 77:15-19); Exhibit 47-1 (Dominguez Tr. Ex. 13); Exhibit 47-2 (Dominguez Tr. Ex. 14).

> E.  **Both Superior and Centene Target Physicians With Restrictions.**

On May 30, 2014, Superior again published a notice to providers that its credentialing policy for allergy testing and allergen immunotherapy would be implemented effective August 1, 2014, and the policy was implemented effective as of August 1, 2014. Exhibit 48 (SHP0541-43). The policy provided that non-specialists could apply for "credentialing" if they wished to continue to provide allergy care. *Id.*

Yet, in discussing such an application, Superior rejected an El Paso physician named Dr. Segapelli, referencing his relationship to UAS. Exhibit 49 (CUA001751-920). The February 4, 2015 discussion of the Credentialing Committee meeting was documented with notes showing that part of the rejection was based on the fact that Dr. Harmon had pointed out that the course under which Dr. Segapelli was seeking credentialing was written by the Chief Medical Officer "of United

Allergy Services (UAS), a company that contracts with general practitioners to set-up allergy labs in offices, and that the cases submitted were dated before the physician had obtained his/her allergy training." Exhibit 49 (CUA001765-66). The minutes of that meeting also reflect that "Dr. Griffin said he is not entirely convinced the policy will hold-up in the court of law if the provider were to file a lawsuit." *Id.*

During that same time, Dr. Segapelli and his clinic, El Paso Pediatrics, threatened to terminate their relationship with Superior, and Superior observed that one of the reasons was because, among other reasons, Superior refused to pay for any allergy services provided by Dr. Segapelli. Admitting internally that it did not want to lose "market share," Superior decided to pay Dr. Segapelli's practice $50,000 but that it would still not pay for UAS-related allergy services, with Superior's Mr. Wise stating: "I am not willing to give on allergy." Exhibit 50 (CUA002158).

Efforts to expand the policy continued into 2016, when Centene adopted a similar policy for its other health plans based on the model it used for Superior. Exhibit 51 (SHP4635-36). Like the original Superior policy, the newer Centene policy limits immunotherapy to specialists. *Id.* And since instituting the policy, Centene has sent additional letters to physicians including into 2018 enforcing the policy against paying for allergy care at primary care clinics or for services associated with UAS. Exhibit 52 (UAS00021451-61), Exhibit 53 (UAS00021462-71), Exhibit 54 (UAS00021472-96).

### F.   Procedural History and Claims Asserted

Plaintiffs, along with various primary care physicians and practices, filed this case in 2017 in Texas state court, and Superior thereafter removed the case to this Court based on "federal question" jurisdiction over the declaratory relief sought in the case. Dkt. 1. Meanwhile, the case was stayed for a period of time while the providers and physicians arbitrated their claims against Superior, which ultimately settled.

After that settlement and the subsequent lifting of the stay, Plaintiffs filed a Second Amended Complaint on September 26, 2019, adding Centene Corp. as a defendant. Dkt. 106. Ultimately, this Court issued reports and recommendations denying both Superior's and Centene's motions to dismiss, including on grounds addressed in this instant motion, and Judge Biery adopted each of those reports and recommendations. Dkts. 135, 146 & 140. Eventually, Superior filed an answer, which currently asserts various affirmative defenses that Centene has also subsequently adopted in its own answer. Dkts. 148 & 215.

## LEGAL STANDARD

Summary judgment is appropriate under Fed. R. Civ. P. 56 "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see* Fed. R. Civ. P. 56(c). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. The Court will view the summary judgment evidence in the light most favorable to the non-movant. *See Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993). "After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). Moreover, on pure questions of law, the Court should enter judgment and instruct the jury where appropriate. *See Kornman & Associates, Inc. v. United States*, 527 F.3d 443, 450 (5th Cir. 2008).

## SUMMARY OF ARGUMENT

The Court should grant partial summary judgment against Defendants' various affirmative defenses because those defenses clearly do not apply to the antitrust claims asserted in this case as a matter of law, or because Defendants cannot point to legally sufficient evidence of the defenses to put them to a jury. First, Defendants' defense that the antitrust claims are foreclosed by *Illinois Brick* is erroneous as a matter of law, as the Supreme Court has repeatedly held that *Illinois Brick* does not apply to boycott claims, and multiple opinions in this District, including those of Chief Judge Garcia and this Court, have similarly held UAS has antitrust standing to assert such boycott claims. Second, Defendants' defense of the First Amendment is also inapplicable, as the factual basis that Defendants used speech to carry out the boycott is not a legally protected right, and Defendants can point to no other First Amendment protection—such as petitioning the government—that would support such a defense. Third, Defendants' affirmative defense of "legitimate competition" does not apply because the allegations of a boycott have been held to be violations of the Sherman Act. Fourth, Defendants' defense of a "failure to join necessary and indispensable parties" is without merit because Plaintiffs may, as a result of joint and several liability, properly choose which antitrust co-conspirators to sue. Fifth, Defendants' defense of failure to mitigate fails because Defendants point to nothing that Plaintiffs could have done to mitigate their damages. And sixth, Defendants' defense of unclean hands must be rejected because there is no evidence that Plaintiffs engaged in any inequitable conduct that bears a direct relationship to this proceeding, let alone any evidence that Defendants were personally injured by any alleged conduct by Plaintiffs.

Finally, the Court should grant partial summary judgment in favor of Plaintiffs on their claim for declaratory relief because Defendants' policy of refusing to reimburse primary care physicians for providing allergy testing and immunotherapy services violates the federal statute

and regulation that prohibit discrimination against providers who are acting within the scope of their license or certification.

For these reasons, Plaintiffs respectfully ask the Court to grant their motion for partial summary judgment.

## <u>ARGUMENT</u>

### I.   The Court Should Grant Summary Judgment Against Various Pled Affirmative Defenses

Plaintiffs' claims against Superior and Centene allege that those Defendants engaged in a conspiracy with other MCOs to restrain output of allergy skin testing and immunotherapy services. The talisman of Plaintiffs' claims is that Defendants agreed with their co-conspirators to boycott UAS through persuasion or coercion of UAS's physicians not to do business with UAS and thereby to eliminate allergy testing and immunotherapy services at numerous primary care clinics.

Section 1 of the Sherman Act provides, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. "Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category." *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959). While the Sherman Act is a criminal statute, Congress enacted the Clayton Act, which gives victims of the anticompetitive conduct a private right of action. Section 4 of the Clayton Act provides a treble damages remedy to "***any person*** who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15 (emphasis added). Similarly, Section 16 of the Clayton Act provides, "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws. . . ." 15 U.S.C. § 26. The Supreme Court has long held that "[t]he statute does not confine its protection to

consumers, or to purchasers, or to sellers." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 472 (1982). "[T]he Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Id.*

**A.      Defendants' *Illinois Brick* Defense is Inapplicable as a Matter of Law.**

Notwithstanding the statutory text of the Clayton Act, Defendants summarily assert in their Sixteenth Affirmative Defense that "Plaintiff's claims are barred in whole or in part under the rule and/or theory set forth in *Illinois Brick*, and subsequent cases interpreting it and applying that doctrine." *Id.* Presumably, Defendants' contention is that under *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 730-36 (1977), UAS is not a proper party to seek relief for Defendants' antitrust violations. Yet, Defendants cannot show how *Illinois Brick* would apply to the group boycott claims asserted in this case, or why this Court should reverse its prior opinion finding standing or rule contrary to Chief Judge Garcia's opinion in *AANMA II* finding standing on summary judgment.

**1.      Supreme Court Authority on Boycotts Does Not Incorporate *Illinois Brick*.**

In 1977, the Supreme Court adopted a limited exception to the broad language of the Clayton Act concerning allegations of damages from inflated prices experienced by downstream consumers. In *Illinois Brick*, the Supreme Court created a bright line rule that an indirect purchaser two steps removed from the market could not pursue an antitrust claim to recover overcharges that had been passed on to them by the direct purchasers. *Id.* The holding of *Illinois Brick* was predicated upon the concern that there would be "a serious risk of multiple liability for defendants" if both direct and indirect purchasers were able to seek duplicative recovery of the same overcharges. *Id.* at 730-31 & n. 11. However, the Supreme Court has never expanded the indirect

purchaser rule to other claims, despite pleas that the risk of duplication or multiple classes of plaintiffs would justify doing so.

For example, five years after *Illinois Brick*, the Supreme Court rejected arguments that the rule of *Illinois Brick* should be extended to group boycotts based upon duplicative recovery of damages by multiple victims of the same boycott. *See McCready*, 457 U.S. at 474-78. In addressing an argument that is strikingly similar to the one Plaintiffs make here, the Court "quickly disposed" of the defendant insurance company's argument that "only psychologists might maintain suit" because they were the ones denied payment. *Id.* at 478. The Supreme Court explained that "[i]f a group of psychiatrists conspired to boycott a bank until the bank ceased making loans to the psychologists, the bank would no doubt be able to recover the injuries suffered as a consequence of the psychiatrists' actions." *Id.* at 484 n.21.

Ever since *McCready*, the Supreme Court has consistently rejected applying the bright line rule of *Illinois Brick* to group boycotts. *See id.*; *see also Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 542 (1983) ("If either of these firms, or the immediate victims of coercion by defendants have been injured by an antitrust violation, their injuries would be direct and, as we held in *McCready*, they would have a right to maintain their own treble-damages action against the defendants."). And recently, the Supreme Court refused to use the "justifications" of *Illinois Brick* to expand its application even as to overcharge cases, noting that all ambiguities should be resolved in "in the direction of the statutory text" to find standing to sue under the Clayton Act. *Apple, Inc. v. Pepper*, 139 S.Ct. 1514, 1522 (2019).

## 2. All Courts Evaluating Plaintiffs' Standing Have Rejected *Illinois Brick*.

In similarly rejecting the application of *Illinois Brick* urged here by Defendants, Chief Judge Garcia rejected the same exact *Illinois Brick* defense against UAS's standing to sue under

the Clayton Act. *See Academy of Allergy & Asthma in Primary Care v. Allergy & Asthma Network/Mothers of Asthmatics, Inc.*, Civil No. 5:14-CV-35-OLG (W.D. Tex. Sept. 29, 2017) ("*AANMA II*"). Applying Supreme Court precedent as it pertains to group boycotts discussed above, Chief Judge Garcia held that both UAS and its physician customers coerced into joining the boycott are proper plaintiffs to assail the boycott:

> A plaintiff who has met the requirement of showing their antitrust injury still must show that it is the "proper plaintiff" to assert claims arising from the anticompetitive acts alleges. *Norris* [*v. Hearst Tr.*,] 500 F.3d [454,] 465 [(5th Cir. 2007)] (internal quotation marks omitted). Courts make this determination by considering "such facts as (1) whether the plaintiff's injuries or their causal link to the defendant are speculative, (2) whether other parties have been more directly harmed, and (3) whether allowing this plaintiff to sue would risk multiple lawsuits, duplicative recoveries, or complex damage apportionment." *Id.* ***The Court finds that Plaintiffs, whose claimed antitrust injury is the loss of profits they would have earned but for their exclusion from the market . . . are proper plaintiffs.*** Since Plaintiffs have produced evidence that Defendants' allegedly unlawful conduct was directed towards UAS and AAAPC-member physicians, there is little to no attenuation between Defendants' allegedly anticompetitive conduct and Plaintiffs' antitrust injuries. Similarly, ***the antitrust injuries in this case, which are "neither derived from nor measured by injuries consumers may have suffered[,]" are distinct from the antitrust injuries recoverable by other potential plaintiffs, such as any supracompetitive prices paid by patients***. [*Andrx Pharm., Inc. v.*] *Biovail* [*Corp., Int'l*,] 256 F.3d [799,] 817 [(D.C. Cir. 2001)] (discussing *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)). The Court therefore finds that Plaintiffs have antitrust standing and are proper plaintiffs, and that summary judgment against them on this basis is not proper.

*Id.* at 28-29 (emphasis added) (footnote omitted). Chief Judge Garcia elaborated in a footnote:

> *See*, *e.g.*, *Andrx Pharm., Inc. v. Biovail Corp., Int'l*, 256 F.3d 799, 816 (D.C. Cir. 2001) (finding proper plaintiff status where "[plaintiff's] alleged injury is not derived from or measured by the injury to consumers; instead it is measured by the loss of profits it would have otherwise made had it not been excluded from the market[;] . . . [it] does not seek damages for profits it would have earned at higher, less competitive prices. . . . [but rather] [i]t seeks damages to compensate for profits it would have earned by competing in the market."). . . .

*Id.* at 28 n.11.

In its May 5, 2020 Report and Recommendation [Dkt. 135] on Superior's motion to dismiss the Second Amended Complaint, this Court reached the same conclusion based on the same controlling authority:

> As for "proper plaintiff" status, courts determine whether a plaintiff is a "proper plaintiff" by considering "such facts as (1) whether the plaintiff's injuries or their causal link to the defendant are speculative, (2) whether other parties have been more directly harmed, and (3) whether allowing this plaintiff to sue would risk multiple lawsuits, duplicative recoveries, or complex damage apportionment." *Norris*, 500 F.3d at 465 (quoting *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1341 (5th Cir. 1988)). Here, ***the injuries UAS alleges*** are not speculative. Moreover, they ***are unique to UAS, such that no other parties are "more directly harmed" and there is no risk of duplicative recoveries***. *See*, *Andrx Pharm., Inc.*, 256 F.3d at 816 (when plaintiff's "alleged injury is not derived from or measured by the injury to consumers" but is instead measured by lost profits it would have realized had it not been excluded from market, injuries are distinct from those recoverable by other potential plaintiffs).

Dkt. 135 at 32 (emphasis added).

Furthermore, on May 14, 2021, District Judge Carl J. Barbier of the United States District Court for the Eastern District of Louisiana filed an order granting UAS's motion for reconsideration of that court's prior order dismissing UAS's claims under Section 1 of the Sherman Act because it was not a proper plaintiff and therefore lacked antitrust standing. *See Academy of Allergy & Asthma in Primary Care, et al. v. Louisiana Health Serv. & Indemn. Co., et al.*, Case No. 2:18-cv-00399-CJP-DPC (E.D. La. May 14, 2021).[1]

The Louisiana court started from the proposition that "[t]he proper plaintiff inquiry considers '(1) whether the plaintiff's injuries or their causal link to the defendant are speculative, (2) whether other parties have been more directly harmed, and (3) whether allowing this plaintiff to sue would risk multiple lawsuits, duplicative recoveries, or complex damage apportionment.'" *Id.* at 1 (quoting *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1341 (5th Cir.

---

[1] A copy of this opinion is attached as Exhibit 55.

1988) (citing *Associated Gen. Contractors*, 459 U.S. at 545)). After discussing *Associated Gen. Contractors*, the Louisiana court stated:

> In the instant matter, UAS alleges that Defendants coerced physicians, including AAAPC members, to stop purchasing services from UAS by denying claims for UAS's services and threatening them with nonpayment, audits, reviews, and exclusion from their provider networks, resulting in many providers terminating their agreements with UAS. ***UAS stands in the same position as the unionized firms in Associated General Contractors who lost business due to the defendants' efforts to coerce customers to switch to nonunion firms and therefore has antitrust standing because it was directly harmed by Defendants***.

*Id.* at 3 (emphasis added) (footnote omitted).

The Louisiana court explained that the direct purchaser rule of *Illinois Brick* did not apply

to UAS (and, indeed, that the defendants in the case had conceded that the rule is inapplicable to

UAS):

> Further, the cases the Court previously relied upon are distinguishable and not applicable here. *Hughes v. Tobacco Institute, Inc.*, 278 F.3d 417, 423 (5th Cir. 2001), turned on application of the direct purchaser rule announced in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745-46 (1977), which Defendants now concede is inapposite. (Rec. Doc. 208, at 6) ("This is not an indirect purchaser case . . . ."). Likewise, *Norris v. Hearst Trust*, 500 F.3d 454 (5th Cir. 2007), involved markedly different circumstances. There, the defendant, the owner of the *Houston Chronicle*, requested that the plaintiffs, its distributors, certify falsely inflated distribution numbers, which would lead to an increase in the defendant's advertising sales and revenue. *Id.* at 463-64. The plaintiffs refused to do so, so the defendant terminated them. *Id.* The court held that the plaintiffs had not suffered antitrust injury because they had not been injured by the anticompetitive aspects of the defendant's conduct, as the intended outcome of the defendant's scheme was to increase demand and prices for newspaper advertising in the Houston metropolitan area and the plaintiffs neither bought nor sold advertising in that market. *Id.* at 466. Thus, they were also not proper plaintiffs because they were not "directly injured by the harm to competition caused or posed by the asserted antitrust violations." *Id*. **Here, by contrast, Plaintiffs claim that Defendants pressured UAS's customers to cease doing business with it. This is a direct injury caused by an antitrust violation.** *See Associated Gen. Contractors*, 459 U.S. at 541. **Therefore, UAS is a proper plaintiff and has antitrust standing.**

*Id.* at 3-4 (footnotes omitted) (emphasis added).

At its base, Defendants' argument under *Illinois Brick* is essentially that there is only a single plaintiff that has the ability to seek redress for a violation of the antitrust laws. But the Supreme Court has rejected that contention even in the limited situation of indirect purchasers addressed in *Illinois Brick*, holding that "*Illinois Brick* did not purport to bar multiple liability that is unrelated to passing an overcharge down a chain of distribution." *Apple, Inc.*, 139 S.Ct. at 1525 ("Basic antitrust law tells us that the 'mere fact that an antitrust violation produces two different classes of victims hardly entails that their injuries are duplicative of one another'") (quoting 2A P. Areeda, H. Hovenkamp, R. Blair, & C. Durrance, *Antitrust Law* ¶ 339d, at 136 (4th ed. 2014)).

The facts before this Court on this motion for summary judgment concerning the injuries alleged by UAS are the same as the facts that were alleged in the complaint that was before the Court when it denied Superior's motion to dismiss. Here, because UAS was excluded from offering its services in the relevant market, it directly suffered antitrust injury for which it has standing to sue. Accordingly, the Court should grant summary judgment against Defendants' *Illinois Brick* affirmative defense, in accordance with its prior holding that UAS has suffered an economic injury that is distinct from that suffered by the primary care physicians and therefore has prudential standing; there is no need to revisit the issue.

**B.   Defendants Cannot Identify Any Support for their First Amendment Defense.**

In their Fifth Affirmative Defense, Defendants plead that their "actions are protected by the First Amendment to the United States Constitution." *Id.* At her deposition as Superior's Rule 30(b)(6) designee on, *inter alia*, certain of Superior's affirmative defenses, Holly Munin of Superior testified that her general understanding of the basis for this affirmative defense is that "we are free to have discussions and create policies on behalf of our members." Exhibit 56 (Superior Rule 30(b)(6) Tr. 82:17-83:4). Ms. Munin confirmed that those discussions Defendants

are claiming to be constitutionally protected were those internal to Superior, not with other MCOs. *See* Exhibit 56 at 83:5-8.

As an initial matter, Plaintiff's Sherman Act claims against Defendants are based on their agreements with competitors and subsequent conduct to carry out a boycott of UAS, including through coercion of UAS's physician customers by means of claim denials, visits, and restrictive policies. Even Defendants admit that third-party agreements are not constitutionally immune, and the Supreme Court long ago rejected any argument that Defendants might make that they cannot be held liable because they engaged in protected conduct or speech as part of their boycott. *See*, *e.g.*, *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949) ("It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute. We reject the contention now.").

In fact, the only recognizable First Amendment defense to antitrust liability that has survived over the many years of antitrust enforcement is the narrow immunity conferred by the *Noerr-Pennington* doctrine, which is confined to activities of petitioning the government for legislative or regulatory action pursuant to the First Amendment's right of petition. But long-established Supreme Court authority holds such immunity does not extend to private conduct to carry out a restraint of trade. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988). Moreover, nowhere do Defendants ever point to how their conduct took the form of governmental petitioning, much less that the conduct was engaged in solely for that reason. There is no general First Amendment defense allowing a defendant's employees to communicate with each other with regard to conduct that would violate the antitrust laws. Accordingly, the Court should grant summary judgment against Defendants' Fifth Affirmative Defense.

**C.     Defendants' Defense of Legitimate Competition Has No Support.**

In their Sixth Affirmative Defense, Defendants assert that their "actions constituted legitimate competition and are therefore justified and protected." *Id.* Considering the allegations in this case, it is hard to fathom how Defendants' agreement with their competitor MCOs to adopt identical restraints on who may offer allergy services and to jointly boycott UAS could constitute "competition" at all, much less that their conduct could be "justified and protected." If, for example, Defendants argue that they may maintain contact with their competitors and engraft the same private restraints after the fact, the Supreme Court has already held such a conscious commitment to a common refusal to deal is not justified—it is illegal. *See, e.g.*, *United States v. General Motors Corp.*, 384 U.S. 127, 142 (1966).

As the Supreme Court held, "[i]t is of no consequence, for purposes of determining whether there has been a combination or conspiracy under § 1 of the Sherman Act, that each party acted in its own lawful interest." *Id.* Similarly, while defendants often claim after the fact that their anticompetitive conduct is "unilateral" or "merely parallel," such claims are not legitimate—no explicit agreement is required, and even good business intentions violate the Sherman Act when they restrain trade. *See id.* at 143-45. Because jointly agreeing to restrict output of services in the market restrains trade, Defendants cannot claim they were acting consistent with competition or that they were otherwise not in violation of the broad language of Section 1 of the Sherman Act.

**D.     Defendants Have Not Properly Raised Any Defense Related to Alleged Necessary and Indispensable Parties.**

In their Seventh Affirmative Defense, Defendants assert that "Plaintiff's claims must fail because they have failed to name necessary and indispensable parties." *Id.* At her deposition as Superior's Rule 30(b)(6) designee, Ms. Munin testified that Superior contended that certain

allergists or associations of allergists may have contributed to UAS's claimed damages, but did not identify any of them by name. *See* Exhibit 56 at 80:7-82:16.

Fed. R. Civ. P. 19 does not require the joinder of co-conspirators, joint tortfeasors, or persons against whom a defendant may have a claim for contribution. *See Allstate Ins. Co. v. Plambeck*, No. 3-08-CV-0388-M, 2009 WL 347423, *5 (N.D. Tex. Feb. 11, 2009); *see also Herpich v. Wallace*, 430 F.2d 792, 817 (5th Cir. 1970). Similarly, antitrust plaintiffs are not required to sue all co-conspirators, and they may instead choose which co-conspirators to make parties to the litigation. *See Wilson P. Abraham Constr. Corp. v. Tex. Indus., Inc.*, 604 F.2d 897, 903-04, n.15 (5th Cir. 1979)*.*

Here, Defendants have no evidence that Plaintiffs failed to join necessary or indispensable parties, and they have never properly identified any supposedly indispensable party in this case. Moreover, Defendants are jointly and severally liable for the whole of the conspiracy. Accordingly, the Court should grant summary judgment against Defendants' Seventh Affirmative Defense.

### E.    Defendants Have Not Identified Any Failure to Mitigate by Plaintiffs.

In their Ninth Affirmative Defense, Defendants assert that "Plaintiff failed to take reasonable action to mitigate the injuries and damages alleged in the Third Amended Complaint." *Id.* "[M]itigation is a method of apportioning damages where the party, 'subsequent to infliction of the harm,' fails to reasonably avoid loss." *Energy Intelligence Group, Inc. v. Kayne Anderson Capital Advisors, L.P.*, 948 F.3d 261, 274 (5th Cir. 2020) (quoting *Tennessee Valley Sand & Gravel Co. v. M/V Delta*, 598 F.2d 930, 932 (5th Cir. 1979)). Here, there does not appear to be anything that Plaintiffs could have done to mitigate their damages other than what they did do—file this lawsuit. In the absence of any evidence that Plaintiffs failed to mitigate their damages, the Court should grant summary judgment against Defendants' Ninth Affirmative Defense.

**F.      Defendants Cannot Identify Any Conduct Supporting Unclean Hands.**

In their Twelfth Affirmative Defense, Defendants assert that "[t]he relief sought by Plaintiff is barred by the doctrine of unclean hands." *Id.* At her deposition as Superior's Rule 30(b)(6) designee, Ms. Munin responded to the question "Do you know if Superior contends whether or not UAS was ever engaged in any type of fraud or fraudulent activity as it related to its conduct?" by answering "I'm not -- I can't answer -- no." Exhibit 56 at 83:9-84:10.

For the doctrine of unclean hands to apply, "the inequitable conduct of the party at issue ordinarily must bear a direct relationship to the proceeding in which the doctrine is invoked." *Claimant ID 100235033 v BP Exploration & Prod. Inc.*, 941 F.3d 801, 812 (5th Cir. 2019) ("'The maxim of unclean hands is not applied where plaintiff's misconduct is not directly related to the merits of the controversy between the parties'") (quoting *Mitchell Bros. Film Grp. v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979)). "'The alleged wrongdoing of the plaintiff does not bar relief unless the defendant can show that he has personally been injured by the plaintiff's conduct.'" *Id.* (quoting *Mitchell Bros. Film Grp.*, 604 F.2d at 863).

Here, Defendants have no evidence that Plaintiffs engaged in any inequitable conduct that bears a direct relationship to this proceeding, let alone any evidence that they were personally injured by any alleged conduct by Plaintiffs. Accordingly, the Court should grant summary judgment on this affirmative defense as well.

**II.     The Court Should Grant Partial Summary Judgment on Plaintiffs' Claim for Declaratory Relief by Construing Certain Health Care Statutes and Regulations Prohibiting Discriminatory Conduct.**

As this case has progressed, the parties have disputed whether the reimbursement policies of Superior and Centene violate the restrictions on reimbursement policies of MCOs administering government programs. Plaintiffs raise that issue through their claim for declaratory relief in their complaint. *See* Dkt. 145, ¶¶ 120-26. And more recently, the parties' experts, Michael Miscoe on

24

behalf of Plaintiffs and Peter Kongstvedt on behalf of Defendants, have advanced dueling interpretations of the applicable statutes and regulations regarding limiting reimbursement in connection with the issue whether Defendants' conduct is inconsistent with industry standards or otherwise coercive to UAS's physician customers.

### A.    Discrimination Against Classes of Providers Contradicts Government Program Regulations.

Defendants and their co-conspirators all administer health insurance under the Medicaid program and thus are bound by certain requirements related to that governmental program. Among those requirements is 42 U.S.C. § 1396u-2(b)(7), titled "Antidiscrimination," which prohibits refusing to pay classes of providers acting within the scope of their license or certification:

> A Medicaid managed care organization shall not discriminate with respect to participation . . . as to any provider who is acting within the scope of the provider's license or certification under applicable State law, ***solely on the basis of such license or certification***. This paragraph shall not be construed to prohibit an organization from including providers only to the extent necessary to meet the needs of the organization's enrollees or from establishing any measure designed to maintain quality and control costs consistent with the responsibilities of the organization.

*Id.* (emphasis added). More recently, Congress expanded the same non-discrimination requirement to all health insurance companies as part of the Patient Protection and Affordable Care Act. *See* 42 U.S.C. § 300gg-5 ("A group health plan and a health insurance issuer offering group or individual health insurance coverage shall not discriminate with respect to participation under the plan or coverage against any health care provider who is acting within the scope of that provider's license or certification under applicable State law").

These non-discrimination requirements, at least as they pertain to Medicaid, have been instituted through rulemaking by the Centers for Medicare & Medicaid Services ("CMS"). Specifically, 42 C.F.R. § 438.12 provides:

> (a) General rules.

(1) An MCO, PIHP, or PAHP may not discriminate for the participation . . . of any provider who is acting within the scope of his or her license or certification under applicable state law, ***solely on the basis of that license or certification.*** . . .

. . .

(b) Construction. Paragraph (a) of this section may not be construed to—

(1) Require the MCO, PIHP, or PAHP to contract with providers beyond the number necessary to meet the needs of its enrollees;

(2) Preclude the MCO, PIHP, or PAHP from using different reimbursement amounts for different specialties or for different practitioners in the same specialty; or

(3) Preclude the MCO, PIHP, or PAHP from establishing measures that are designed to maintain quality of services and control costs and are consistent with its responsibilities to enrollees.

*Id.* (emphasis added).

### B.      The Statutory Interpretation of Defendants' Expert that the Restrictions do Not Apply to "Reimbursement" Contradicts the Law.

Consistent with their agreement with other MCOs to restrict output of allergy services, both Superior and Centene have adopted reimbursement policies that on their face contradict statutory and regulatory restrictions on MCOs. For example, in 2014 Superior instituted a policy, after receiving a similar policy from competitor CHC, that stated, "[a]llergy skin testing, assessment of test results, and decision making regarding therapy is considered to be a specialty area." Exhibit 29. In 2016, Centene adopted a similar policy that stated, "Antigens are prepared by an allergist, immunologist, or otolaryngologist who has examined the patient." Exhibit 51.

These policies are discriminatory on their face. As Defendants and their experts have conceded in their testimony, there is no genuine dispute of material fact that when the services in question are offered in a primary care clinic, including through a family physician assisted by a UAS technician, those services are within the scope of practice under Texas state law. Dkt. 234-4

at 38:12-40:1. The Texas Medical Board has also held that allergy testing and immunotherapy services performed by a family physician and a UAS technician meet the "standard of care" under this same law. *See*, *e.g.*, Exhibit 57 (PROVIDER_ARBITRATION00823). In fact, this scope of practice is recognized nationwide, as in 1989 the United States Department of Health and Human Services explicitly adopted rules finding that there is no reason to restrict allergen immunotherapy services to the offices of specialists because "[a]s a technical/medical matter, there appears to be no reason to limit participation in this way." Exhibit 58 (PROVIDER_ARBITRATION01111). It is for that reason that manuals governing allergy care under governmental healthcare programs, such as the CMS manual and the Texas Medicaid Providers Manual, do not restrict these services to the offices of specialists but include the offices of primary care providers as well. *See, e.g.*, Chapter 15 Medicare Benefit Policy Manual 50.4.4.1 "Antigens" ("Payment may be made for a reasonable supply of antigens that have been prepared for a particular patient if: (1) the antigens are prepared by a physician who is ***a doctor of medicine or osteopathy***, and (2) the physician who prepared the antigens has examined the patient and has determined a plan of treatment and a dosage regimen.").[2]

In order to argue that what Superior did was "justified," its expert Dr. Kongstvedt asserted that the non-discrimination provisions do not apply to reimbursement decisions, only the decision of whether to contract with certain physicians. He reasoned that the former concern "scope of services," while the latter concerns "scope of practice." Dkt. 234-2 at 34. But this bizarre legal opinion contradicts the plain language of the statutes, which concern all "participation" in

---

[2] The current version of this manual may be accessed on the cms.gov website and was accessed on May 14, 2021 at the following: https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/bp102c15.pdf.

providing services within the scope of practice, which would include contracting and reimbursement.

In its responses to public comments regarding Section 438.12, CMS confirmed that Section 438.12 does indeed apply to prohibit a managed care organization to discriminate against classes of providers by refusing them *reimbursement*:

> [T]he text of § 438.12(a)(1) is adequate to prohibit discrimination for provider participation, *reimbursement*, and indemnification as it specifies that an MCO, PIHP, or PAHP may not discriminate in the participation, *reimbursement*, or indemnification of any provider who is acting within the scope of his or her license or certification under applicable State law, solely on the basis of that license or certification.

> . . .

> We believe that the commenters' references to discrimination "on the basis that the provider furnishes certain services under their scope of practice, on the basis of the patients they serve, on the basis of the professional activity or advocacy they conduct" or "services that the managed care plan objects to" meant that the activities and services triggering the discriminatory treatment are services and activities within the scope of the provider's licensure. As such, this is already addressed in proposed § 438.12(a)(1), which clearly indicates that a managed care plan may not discriminate against a provider solely for providing services within their scope of licensure.

81 Fed. Reg. 27498-01, 27749-50 (May 6, 2016).

As raised in prior *Daubert* motions, neither Superior nor its experts should be permitted to claim that it is "legal" to institute restrictions on where allergy care may be provided and who may be reimbursed. As an initial matter, Defendants may claim their conduct is consistent with the law when taken unilaterally, but that does not shield them from antitrust liability for taking such action as part of an agreement to restrain trade—otherwise lawful conduct is no longer lawful when undertaken by agreement with third parties. *See American Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946); *see also United States v. Gen. Motors Corp.*, 384 U.S. 127, 142-43 (1966). Second, and more to the point here, the Court is the sole arbiter of the law in this case, and the law

is clear: While MCOs are not required to contract with or pay equally every provider acting within the scope of his or her practice under the applicable state law, they cannot simply refuse to reimburse an entire class of providers. A blanket refusal to reimburse an entire class of providers is discriminatory under the applicable regulations, and the Court should declare as much.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court enter an order granting partial summary judgment in their favor and against Defendants (1) against Defendants' Fifth, Sixth, Seventh, Ninth, Twelfth, and Sixteenth Affirmative Defenses; and (2) on Plaintiffs' claim for Declaratory Relief.

Dated: May 14, 2021

Respectfully submitted,

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

By:   /s/ *Casey Low*
Casey Low
Texas Bar No. 24041363
Dillon J. Ferguson
Texas Bar No: 06911700
Jeffrey D. Wexler (admitted *pro hac vice*)
401 Congress Ave., Suite 1700
Austin, Texas 78701-4061
Phone: (512) 580-9600
Fax:    (512) 580-9601
casey.low@pillsburylaw.com
dillon.ferguson@pillsburylaw.com
jeffrey.wexler@pillsburylaw.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been forwarded to all counsel of record via the Court's electronic filing system on May 14, 2021.

_/s/ Casey Low_
Casey Low